IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE BROWN,<br><br>               Plaintiff,<br><br>     vs.<br><br>FIRST RELIANCE STANDARD LIFE<br>  INSURANCE COMPANY,<br><br>              Defendant. | )<br>)<br>)<br>)<br>) Civil Action No. 10-486<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Pending before the Court are cross motions for summary judgment filed by Defendant First Reliance Standard Life Insurance Company (Doc. No. 18) and Plaintiff Julie Brown (Doc. No. 22.) Plaintiff seeks short-term disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA.") For the reasons discussed below, Plaintiff's Motion is denied and Defendant's Motion is granted.

## I.   INTRODUCTION

### A.   Factual Background[1]

From December 27, 2004, through at least November 9, 2007, Plaintiff Julie Brown was employed as a machine operator at National

---

[1]   The facts in this section are undisputed, based on the Court's reading of Defendant's Concise Statement of Material Facts, Doc. No. 20; the Appendix thereto, Doc. No. 21; Plaintiff's Concise Statement of Material Facts, Doc. No. 24; and Plaintiff's Response to Defendant's Concise Statement of Facts, Doc. No. 25.

Envelope Corporation ("National"), located in Fayette County, Pennsylvania. National provided its employees short-term disability benefits ("the Plan") under a policy offered and maintained by Defendant First Reliance Standard Life Insurance Company ("First Reliance.") Ms. Brown was enrolled in the Plan as of November 2007.

At the time of the events in question, Ms. Brown was approximately 45 years old. She had previously given birth to four children; a fifth pregnancy ended in miscarriage. (Administrative Record, Doc. No. 21, "AR," at 92.) She had then undergone a tubal ligation, but after an unsuccessful attempt to reverse that procedure, she began consulting in June 2006 with Dr. Anthony Wakim, a fertility specialist at Magee Women's Hospital in Pittsburgh, Pennsylvania. Ms. Brown then decided that she wanted to proceed with in vitro fertilization ("IVF.") [2] In October 2007, Dr. Wakim described Ms. Brown's prognosis for such a pregnancy as "very poor." (AR at 109, 111, 113, 116.) [3]

---

[2] In vitro fertilization "is an assisted reproductive technology that involves administration of fertility drugs to the woman, surgical extraction of her eggs, fertilization in a laboratory, and surgical implantation of the resulting embryos into the woman's womb. Each IVF treatment takes weeks to complete, and multiple treatments are sometimes needed to achieve a successful pregnancy." Hall v. Nalco Co., 534 F.3d 644, 645-646 (7th Cir. 2008), citing The Merck Manual of Medical Information, 1418-19 (Mark H. Beers, MD, et al. eds., 2d home ed. 2003), and the Mayo Clinic Family Health Book, 1069-70 (Scott C. Litin, MD, ed., 3d ed. 2003).

[3] In the administrative record, Ms. Brown is also referred to as "Julie

In the fall of 2007, Ms. Brown underwent a number of tests and examinations in preparation for the IVF procedure. She continued working until Friday, November 9, 2007. Between November 12 and November 26, Ms. Brown visited the Magee Clinic several times for sonograms, blood tests and physical examinations, culminating in a surgical procedure for removal of an egg on November 23 and implantation of the fertilized egg on November 26. (AR 106.) Plaintiff subsequently learned that the IVF procedure had been successful and she was pregnant.

Meanwhile, on November 19, Ms. Brown submitted a claim for short-term disability ("STD") benefits under the Plan. In her claim, her employer stated that the reason Ms. Brown had stopped work as of November 9, 2007, was "in vitro fertilization." (AR 183.) In an Attending Physician's Statement submitted with the claim, Dr. Wakim indicated that Ms. Brown would not be able to perform her job beginning on November 12, 2007, through at least December 14, 2007, and possibly longer depending on "pregnancy testing following IVF." (AR 184.)

On December 18, 2007, Plaintiff's physician released her to return to work but restricted her to work which required no heavy lifting (i.e., no more than 10 pounds) and no continuous standing. (AR 103.) Ms. Brown attempted to return to work as of that date,

---

Sandoval" and "Julie Sandoval Brown."

3

but learned that her employer could not accommodate these restrictions and she was laid-off. (AR 42.)

On January 18, 2008, First Reliance notified Ms. Brown that it was denying her claim for short-term disability benefits for a combination of reasons. First, under the terms of the insurance policy between National and First Reliance, undergoing in vitro fertilization was not considered a "Sickness" or "Injury," as those terms were defined. Secondly, the medical records Ms. Brown had submitted in support of her application for benefits had not reflected any side effects from the treatment which would have prevented her from working as of November 12, 2007. (AR 68-69.) Although the letter from First Reliance advised Ms. Brown of her right to have this decision reviewed, she did not request Defendant to do so at that time.

On May 6, 2008, Ms. Brown filed a second claim for benefits, identifying her condition as pregnancy and again indicating that her disability began as of November 12, 2007. According to the medical records provided by her obstetrician, Dr. James Nolfi, in support of this claim, her anticipated delivery date would be August 15, 2008, and she would be able to return to work on September 29, 2008. In the interim, she was still restricted from any work which required continuous standing or lifting more than 10 pounds. Among Dr. Nolfi's records was an undated, unsigned document which indicated

4

Plaintiff could perform "no heavy lifting" and was unable to perform "continuous standing." Her serious health condition was described as pregnancy and the form noted that "IVF treatment resulted in pregnancy." (AR 102; 152-153.)

A few days later, on May 16, 2008, Ms. Brown appealed the January 18, 2008 denial of benefits, stating that her "conscious decision" to become pregnant "should have nothing to do with the decision of eligibility of benefits." (AR 85.) She also contended that she had mentioned negative side effects of the IVF treatment to her nurse and attached drug monographs provided by her pharmacist in which she underlined the side effects she had experienced. (AR 87-91.)

At this point, First Reliance undertook a comprehensive internal review of Plaintiff's entire claim file and provided the file to an independent specialist in obstetrics and gynecology, Dr. Rafat A. Abbasi. (AR 57-58.) Dr. Abbasi agreed that the record reflected Ms. Brown had had an "uneventful progress. She did IVF without problems or incident. There was no hyperstimulation noted and no complications noted. There were no side effects noted." (AR 71.) He commented that based on his review of the documentation, "no restrictions and limitations are supported according to the records." (AR 71.)

Based on these reviews, First Reliance again informed Ms. Brown on June 12, 2008, that it had concluded she was not disabled at the

5

time she had stopped working and that her initial claim for benefits was again denied. Moreover, because she was not actively at work when she became pregnant, and thus not in an "Eligible Class" of National employees covered by the Plan, her second request for short term disability coverage beginning with the IVF and throughout the course of her pregnancy was also denied. (AR 57-61.)

After her baby was born, Ms. Brown returned to work at National until she voluntarily left in May 2009. (Affidavit of Julie Brown, Doc. No. 22, Exh. 1.)[4] Ms. Brown did not appeal the decision of June 12, 2008, denying her second application for benefits, inasmuch as First Reliance stated in that letter that she had exhausted her administrative remedies available under the Plan. (AR 60.)

B. Procedural Background

Having exhausted her administrative appeals with First Reliance, Plaintiff filed suit in this Court on April 14, 2010. In her one-count complaint, Plaintiff claims that First Reliance abused its discretion for a number of reasons in denying her request for short-term disability benefits while undergoing IVF treatments and

---

[4] Under most circumstances, "the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation." Kosiba v. Merck & Co., 384 F.3d 58, 67 n.5 (3d Cir. 2004); Post v. Hartford Ins. Co., 501 F.3d 154, 168 (3d Cir. 2007) (in deciding summary judgment in an ERISA denial case, the court is generally limited to the facts known to the plan administrator at the time the decision was made.) The Court has not considered the statements made by Ms. Brown in her affidavit as evidence, but rather provides this information only to complete the factual account.

during the resulting pregnancy.

Following unsuccessful mediation in July 2010, the parties filed the pending cross motions for summary judgment and fully briefed the issues. The matter is now ripe for decision by the Court.

## II. JURISDICTION AND VENUE

The parties agree that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132(a)(1)(b) and (e)(1). Venue is properly laid in the Western District of Pennsylvania inasmuch as the alleged ERISA violations occurred within this district. *See* 29 U.S.C. § 1132(e)(2).

## III. STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment if the party so moving can show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Sollon v. Ohio Cas. Ins. Co., 396 F. Supp.2d 560, 568 (W.D. Pa. 2005). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

In considering a motion for summary judgment, the court must view all evidence in the light most favorable to the non-movant,

accept the non-movant's version of the facts as true, and draw all reasonable inferences and resolve any conflicts in its favor. Sollon, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). In short, the movant must show that if the pleadings, depositions and other evidentiary material were admissible at trial, the other party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the movant has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." Celotex, id. at 322-323; Sollon, id.; Fed.R.Civ.P. 56(e). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations, or mere suspicious beliefs. Liberty Lobby, id. at 250-252; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

This Court may resolve cross motions for summary judgment concurrently. *See* InterBusiness Bank, N.A. v. First Nat'l Bank of

Mifflintown, 318 F. Supp.2d 230, 235 (M.D. Pa. 2004), *citing* 10 Charles A. Wright *et al.*, Federal Practice and Procedure § 2720 (3d ed. 1998.) When doing so, the court must consider each motion independently and must view the evidence in the light most favorable to the non-moving party with respect to each motion. Pichler v. Unite, 542 F.3d 380, 386 (3d Cir. 2008); Clevenger v. First Option Health Plan of New Jersey, 208 F. Supp.2d 463, 468-469 (D. N.J. 2002). "A party's concessions made for purposes of its own summary judgment motion do not carry over into the court's consideration of the opposing party's motion." LaManna v. Special Agents Mut. Benefits Ass'n, 546 F. Supp.2d 261, 267 (W.D. Pa. 2008), *citing* Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co., 10 F.3d 144, 150 (3d Cir. 1993).

The question of whether the defendant is entitled to judgment as a matter of law under the standards courts apply when determining if benefits protected by ERISA have been wrongfully denied is one the courts have found particularly well-suited for summary resolution. Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003) (Because there is no right to a jury trial under ERISA, the district court typically acts as the finder of fact and conducts a bench trial "on the papers.")

## IV. **ANALYSIS**

### A. The Parties' Arguments

In its motion for summary judgment, Defendant argues that under the terms and definitions governing the Plan, Ms. Brown was not eligible for benefits at the time she left her employment on November 9, 2007, because undergoing IVF treatments was neither a "Sickness" nor "Injury" covered by the short-term benefits provisions. Her subsequent pregnancy, which First Reliance concedes would have been covered under the "Sickness" provisions of the Plan, was not covered because Ms. Brown was not "actively employed" when she became pregnant in late November 2007 and therefore not eligible for coverage. Under established Supreme Court and Third Circuit precedent, where the ERISA-covered plan in question gives the administrator of the plan discretionary authority, such discretion encompasses the determination of eligibility for benefits, as occurred here. Because the administrator of the plan acted consistently with the unambiguous terms of the Plan and within its discretion in denying benefits, summary judgment must be granted in favor of First Reliance. (Defendant's Motion for Summary Judgment, ¶ 10, *citing* Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), and Schwing v. Lilly Health Plan, 562 F.3d 522 (3d Cir. 2009).)

Conversely, Plaintiff argues that substantial evidence appears

in the administrative record to support her position that the IVF "procedure" actually began with a series of examinations and injections on November 12, 2007, not the date of the actual implantation, November 26, 2007. Therefore, the limitations which her physicians imposed effectively caused her to become disabled as of the prior date, first because her physician required her to be off from work during the two weeks prior to the fertilization, then, after she was allowed to return to work, her employer could not provide the light work to which she was limited. (Plaintiff's Brief in Support of Motion for Summary Judgment, Doc. No. 23, "Plf.'s Brief," 3-4.) Second, Defendant acted arbitrarily and capriciously in making its decision regarding her second application by refusing to accord any weight to the Medical Certification Statement required by National because it was not signed, even though it was obvious from the face of the document that it was generated by the Magee Clinic. Moreover, the letter of June 12, 2008, denying the appeal of the first application and her second claim for benefits, was the first time Plaintiff had been apprised that this was among the reasons for denying her claim, far too long after she could have taken any steps to rectify the omission of a signature. (Id., 10-11.)

Ms. Brown also argues that First Reliance's refusal to allow her to remediate the deficiencies which were the basis for the denial -- but were first made known to her in the letter of June 12, 2008

11

-- violates the ERISA provisions which require benefit plans to provide adequate notice to the plan beneficiaries. (Plf.'s Brief at 11-14.) Fourth, she argues that the Plan language is not only vague but violates the special standard of care imposed by ERISA upon a plan administrator to discharge its duties solely in the interests of the participant and beneficiaries of a plan. (Id. at 14-19.) Finally, Ms. Brown contends that First Reliance ignored substantial evidence supporting her claim when it refused to acknowledge that she was legitimately limited to only light duty work owing to the risks inherent in her IVF treatments and subsequent pregnancy. (Id. at 19-23.)

## B. Judicial Review of Benefits Decisions Covered by ERISA

ERISA permits a participant or beneficiary of an insurance plan covered by ERISA to bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the term of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). As the United States Court of Appeals for the Third Circuit pointed out in Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997), ERISA itself does not establish the standard of review for an action brought under § 1132(a)(1)(B). In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*

12

standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If, however, the plan does provide the administrator with discretionary authority, the standard of review is more deferential, and the court applies an abuse of discretion standard. *See* Howley v. Mellon Fin. Corp., 625 F.3d 788, 792 (3d Cir. 2010), *citing* Firestone, id. at 111. This deferential standard applies not only to decisions concerning interpretation of the plan itself, but also to the administrator's fact-based determinations. Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1187 (3d Cir. 1991). In short, "when the arbitrary and capricious standard[5] applies, the decision maker's determination to deny benefits must be upheld unless it was clear error or not rational." Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1141 (3d Cir. 1993) (internal quotation omitted.)

Prior to the Supreme Court's recent decision in Glenn and the Third Circuit Court of Appeals' application thereof in Schwing, courts in this Circuit had applied a "sliding scale" when reviewing claims that the administrator of a plan covered by ERISA had abused its discretion in determining eligibility for benefits. *See* Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377, 392 (3d Cir.

---

[5] In reviewing ERISA cases involving denial of benefits by the plan administrator, the Third Circuit Court of Appeals uses the phrase "arbitrary and capricious" interchangeably with "abuse of discretion." Howley, 625 F.3d at 793, *citing* Schwing, 562 F.3d at 526 n.2.

2000), applying a "heightened arbitrary and capricious standard of review." However, the Supreme Court held in Glenn that when the terms of a plan grant discretionary authority to the administrator, it is appropriate for court to apply a deferential standard of review, even in the face of a conflict created, for example, when the same entity both funds and evaluates benefit claims. Glenn, 554 U.S. 105 at 117, stating that in ERISA cases, courts are to "determine lawfulness by taking account of several different, often case specific, factors, reading a result by weighing all together;" *see also* Badawy v. First Reliance Std. Life Ins. Co., 581 F. Supp.2d 594, 602 (S.D. N.Y. 2008) (the existence of such conflicts is "just one 'factor' among many that may serve as a 'tiebreaker' when other considerations are in equipoise.") The Third Circuit Court of Appeals thereafter acknowledged that its

"sliding scale" approach is no longer valid. Instead, courts reviewing the decisions of ERISA plan administrators. . .in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator . . . abused its discretion.

Schwing, 562 F.3d at 525.

An administrator abuses its discretion only if the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Howley, 625 F.3d at 792, *quoting* Abnathya v.

Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993). In determining if an administrator's interpretation of a plan is "reasonable," the Court is directed to consider the following factors:

(1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

Howley, 625 F.3d at 793.

Both during the initial period in which the claimant seeks benefits and in the summary judgment process, it is the claimant's burden to show she was disabled and entitled to benefits, not the administrator's burden to show she was not disabled. Houser v. Alcoa, Inc., CA No. 10-160, 2010 U.S. Dist. LEXIS 128281, *23 (W.D. Pa. Dec. 6, 2010); Morales-Alejandro v. Medical Card Sys., 486 F.3d 693, 700 (1st Cir. 2007). Similarly, when a court is determining whether the denial of benefits by the plan administrator was arbitrary and capricious, the burden is on the claimant/plaintiff. Moskalski v. Bayer Corp., CA No. 06-568, 2008 U.S. Dist. LEXIS 39970, *12-*13 (W.D. Pa. May 16, 2008), citing Stout v. Bethlehem Steel Corp., 957 F. Supp. 673, 691 (E.D. Pa. 1997).

## C. Terms and Conditions of the Policy

We begin with a summary of the relevant definitions set out in the Policy and the criteria which must be satisfied in order for a participant to receive short-term disability benefits.

According to the version of the short-term disability insurance policy which was in effect between November 2007 when Ms. Brown first applied for STD benefits and June 2008 when she received a letter from First Reliance informing her that she had exhausted all her administrative appeals,[6] all "active, full-time" union employees of National at the Scottsdale facility were eligible to participate in the plan at no cost to themselves. "Full-time" was defined as working a minimum of 40 hours during the person's regular work week. (Supplemental Administrative Record, Doc. No. 30, Exh. A, "Policy," 1.0 and 2.0.)

An employee who met the eligibility requirements of the Policy and was enrolled for STD insurance coverage was referred to as "an Insured." "'Actively at work' and 'active work' means the person [is] actually performing on a full-time basis each and every duty pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such

---

[6] The Policy which was provided as part of the administrative record submitted by Defendant at Doc. No. 21 (see AR 1-19) was not the version in effect during the period noted above. The Court directed Defendant to provide a copy of the correct version of the Policy which was filed at Doc. No. 30, Exh. A.

16

as vacation, jury duty and funeral leave, but does not include time off as a result of Injury or Sickness." (Policy, 2.0.) There were four conditions under which STD insurance coverage would be terminated; the only one relevant to this matter is that coverage terminates on "(2) the date the Insured ceases to be in a class eligible for this insurance." (Policy, 6.0.)

With some exclusions not relevant here, the Plan paid a maximum of 60% of the Insured's salary per week for a period of up to 20 weeks "if an Insured: (1) is disabled due to Sickness or Injury; and (2) becomes disabled while insured by this Policy." (Policy, 1.0 and 7.0.) "Disabled" was defined to mean "the Insured is: (1) unable to do the material duties of his/her job; and (2) not doing any work for payment; and (3) under the regular care of a physician." (Id., 2.0.) "Injury" was defined as "bodily injury resulting directly from an accident independent of all other causes," and "Sickness" as an "illness or disease causing disability" and explicitly included "pregnancy, childbirth, miscarriage or abortion, or any complications therefrom." In the case of either Injury or Sickness, the cause of the disability had to have begun while the person was an Insured. (Id., 2.0-2.1.)

Finally, it is important to note that the Policy expressly granted discretionary authority to First Reliance, that is:

First Reliance Standard Life Insurance Company shall serve

17

as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

(Policy, 5.0.)

## D.     The November 2007 Application, Denial and Appeal

1. *Disability beginning November 12, 2007:* There is no question that Ms. Brown ceased working at National on Friday, November 9, 2007, and applied for STD benefits beginning on Monday, November 12, 2007. The question is, was she "Disabled" - as that term is defined by the Policy - as of November 12, 2007? As noted in the previous section, disability benefits under the Policy may only be awarded if, as the result of Sickness or Injury, Ms. Brown was unable perform the material duties of her job, was not doing other work for payment, and was under the regular care of a physician. The second and third criteria are not in question here, nor is there any claim of disability due to an Injury. Therefore, we need not consider those possible elements of her claim.

Was Ms. Brown unable to perform the material duties of her job as the result of a "Sickness" on November 12, 2007? The answer must be no. The condition for which she was being intensively treated beginning on November 12, 2007, was infertility. Although she argues that undergoing the preliminary procedures in anticipation

18

of the actual IVF surgeries on November 23 and 26 were "complications" of pregnancy, the common definition of a "medical complication" is "an *additional* disorder or condition that develops *during the course of an existing one*" or "a *secondary* disease, an accident or a negative reaction occurring *during the course* of an illness and usually aggravating the illness." *See*, respectively, the on-line versions of the Oxford English Dictionary at www.oed.com/view/Entry/ 37711?redirectedFrom=complication#, definition d, and the American Heritage Dictionary at http://education.yahoo.com/reference/ dictionary/entry/complication (emphasis added in each case);[7] *see also* Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir. 1989) ("[S]traightforward language in an ERISA-regulated insurance policy should be given its natural meaning.") Logically, treatment for infertility cannot be considered a complication of pregnancy since infertility and pregnancy are mutually exclusive states of being. Prior to November 12, 2007, it is clear Ms. Brown was not disabled by her infertility since she had, apparently, worked steadily at National beginning in 2004, despite having undergone a tubal ligation in 1993 and an unsuccessful attempt at reversal in 1997. (AR 92.)

---

[7] These definitions do not appear in the administrative record but are provided to assist the reader. *See* Kosiba, 384 F.3d at 69 (A court may use evidence outside the administrative record in order to better understand the medical issues involved.)

Ms. Brown also argues that the only reason she was able to successfully conceive through IVF was that she rigorously followed her physician's instructions and remained off work beginning on November 12, 2007. (Plf.'s Brief at 21.) The medical evidence shows that prior to that date, she had undergone a number of tests and examinations to determine her fitness for the IVF procedure. On November 12, she began a course of self-injections prescribed by her physician, which she continued until at least December 7, 2007. (AR 41). During the period November 12 through November 26, she also had numerous medical appointments and examinations at the Magee Clinic in preparation for the IVF egg extraction and implantation procedures performed on November 23 and 26. However, nothing in the medical evidence provided by Dr. Wakim indicates that he suggested or required that she completely stop working as of November 12, 2007, except the conclusory statement in the attending physician's portion of the application form that she would be disabled between November 12 and December 14, 2007, depending on the outcome of the IVF procedure. (AR 183.)

As callous as it may seem, while Ms. Brown may have greatly desired another child and was willing to undergo significant effort, discomfort, and expense in order to achieve this goal, the question was not whether these treatments required considerable time off from work beginning on November 12, 2007, it is whether she was "Disabled,"

as that term is defined in the Plan. There is nothing to indicate that she was experiencing "Sickness" which resulted in disability as of that date. Thus, we must conclude, based on our review of the administrative record, that the plan administrator's decision denying benefits because Ms. Brown was not disabled as of November 12, 2007, was reasonable and neither arbitrary nor capricious.

 2. *Notification of denial:* The conclusion that First Reliance was not arbitrary and capricious in denying disability benefits while Ms. Brown was undergoing the in vitro fertilization process does not end our analysis, however, because Plaintiff also claims the denial letter of January 18, 2008, did not conform with ERISA requirements. Specifically, Ms. Brown argues that the letter failed to include a description of the additional information needed to perfect her claim and why it was necessary. Moreover, it failed to mention a reason for the denial which would be given in the letter of June 12, 2008 (discussed below), that is, she was not considered an employee as of November 12, 2007. (Plf.'s Brief at 10-11.)[8]

ERISA requires that every employee benefit plan "provide adequate notice in writing to any participant. . .whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be

---

[8] Because Plaintiff's brief frequently combines arguments concerning both denial letters, in order to avoid addressing those arguments twice, we have chosen to address them in the section below discussing the June 12, 2008 letter.

understood by the participant." 29 U.S.C. § 1133(1). The

associated regulations require that the notification of any adverse

benefit determination

> shall set forth, in a manner calculated to be understood
> by the claimant –
>
> (i) The specific reason or reasons for the adverse
> determination;
>
> (ii) Reference to the specific plan provisions on
> which the determination is based;
>
> (iii) A description of any additional material or
> information necessary for the claimant to perfect the
> claim and an explanation of why such material or
> information is necessary;
>
> (iv) A description of the plan's review procedures
> and the time limits applicable to such procedures,
> including a statement of the claimant's right to bring a
> civil action under section 502(a) of the Act following an
> adverse benefit determination on review[.]

29 C.F.R. § 2560.503-1(g)(i)-(iv).

Under these regulations, a notice is sufficient if it is "in

substantial compliance with the governing regulation." *See* Mazur

v. Hartford Life & Accident Co., CA No. 06-1045, 2007 U.S. Dist. LEXIS

99927, * 37 (W.D. Pa. Nov. 8, 2007); Kao v. Aetna Life Ins. Co., 647

F. Supp.2d 397, 411 (D. N.J. 2009). When determining if the notice

satisfies these requirements, the court must consider all exchanges

between the claimant and the plan administrator in order to determine

if the information was adequate under the circumstances. Wade v.

22

<u>Hewlett-Packard Dev. Co. LP Short Term Disability Plan</u>, 493 F.3d 533, 539 (5th Cir. 2007); <u>Houser</u>, 2010 U.S. Dist. LEXIS 128281 at *29.

We begin our consideration of Plaintiff's "inadequate notice" argument with a summary of the relevant information provided by Ms. Brown, her employer, and Dr. Wakim in support of the initial claim.

Ms. Brown stated that she was first unable to work as of November 12, 2007. The form described Ms. Brown as a member of insurance Class 5 under the First Reliance Policy and further indicated that she was not as of that date receiving sick leave benefits from the employer or unemployment compensation. The stated reason for stopping work was "in vitro fertilization." Attached to the form was a statement dated November 21, 2007, and signed by her attending physician, Dr. Wakim. In that portion of the form, Dr. Wakim indicated that the diagnosis was "$2°$ infertility;" she required weekly/daily treatment; and the condition was not due to injury or sickness arising from her employment. The doctor further stated that Ms. Brown was not able to perform her job continuously from November 12 through December 14, 2007, but the date she would be able to return to work would depend on the results of a pregnancy test following IVF. (AR 184.) The cover form was signed by Susan Ahlborn on behalf of National on November 28, 2007, and, according to the imprinted fax record, Defendant received both documents the same day. (AR 183.)

23

According to the administrative record, on December 3, 2007, Ellen Ghirlanda, an employee in the STD Claims Department of First Reliance, called Ms. Brown and explained the policy definitions of illness and injury. When Ms. Brown confirmed that the treatments she was undergoing were elective, Ms. Ghirlanda noted that "I told [her] policy does not cover elective procedures and we need [medical records] for our medical staff to review. Again I explained that disability covers illness & injuries." (AR 40-41.)

Ms. Ghirlanda was corrected later that day by Rosetta Davis, a Claims Examiner, who pointed out that "elective medical procedure and surgery are not exclude[d] by the STD policy. However, we must determine if the claimant is truly disabled after undergoing an elective medical procedure or elective surgery. I would request the claimant's medical records and refer for medical review to determine is she disabled and the duration of the disability." (AR 40.)

Ms. Ghirlanda telephoned Ms. Brown the following day and explained that the medical department needed to review the complete file and informed her twice that the "policy does not exclude elective procedures, but I need guidance weather [sic] this is considered an 'illness' according to the contract. I will contact her when review is complete." (AR 41.)

In a medical review performed the next day, December 5, 2007, Laurie Frate, a registered nurse, commented, "Per the attending

24

physician statement the claimant's primary diagnosis is infertility. She is undergoing in vitro fertilization. This is not considered an illness and does not support work impairment." (AR 34.)

On December 7, Ms. Brown and Ms. Ghirlanda spoke again by telephone. Ms. Brown informed her that the injections to facilitate production of ova had begun on November 12 and that she was still self-injecting other medications. Ms. Ghirlanda "explained to [Ms. Brown] that based on the medical [sic] we have this is not an illness and not a disability. However, we are going to request medical records from Dr. Wokim [sic] from 11/12/07 to present. If medical [sic] supports all the side effects she has mentioned then we can review the claim again for disability." In another call on December 11, Ms. Ghirlanda told Ms. Brown that despite a request to Dr. Wakim, First Reliance had not received the medical records. Ms. Brown told Ms. Ghirlanda that she was pregnant. (AR 41.)

Ms. Frate reviewed the file again and noted on December 20, 2007, that "Per review of the medical records submitted the claimant was undergoing medications for preparation for in vitro fertilization. The claimant underwent embryo transplant on 11/26/07. Review of records does not indicate any adverse reaction to the medications. As noted in prior RN review a diagnosis of infertility or preparation for implantation does not preclude work capacity." (AR 34.)

25

On January 7, Ms. Ghirlanda explained in another call to Plaintiff that there was no evidence in the medical records about complaints of side effects. When Plaintiff said "they" were not sending the correct information and that it would "take forever" to get documentation from her physicians, Ms. Ghirlanda told her, "we will be sending a denial letter based on the information we have received. She can appeal the denial and forward additional medical [records] with the appeal." (AR 41-42.)

On January 18, 2008, Ms. Ghirlanda wrote to Ms. Brown, stating that the insurer had received her claim "which indicated you were out of work and disabled due to In Vitro Fertilization, secondary to pregnancy." She pointed out that Defendant's policy with National's defined "Disabled" to mean "the Insured is unable to do the material duties of her job," and defined "Sickness" as meaning "illness or disease causing disability which begins while an Insured. Sickness includes pregnancy, childbirth, miscarriage or abortion, or any complications there from." She then stated, "The In Vitro fertilization procedure is not considered an illness according to your employer's policy." Moreover, the medical record did not reflect any of the side effects from the "treatment" (presumably referring to the IVF procedure) which would have prevented her from working. The request for disability benefits beginning November 12, 2007, was therefore denied. (AR 154.)

26

The letter continued with what appears to be standard language outlining how Ms. Brown could request a review of the decision, the time frame in which she could expect a response, and the materials she was entitled to receive upon request, e.g., a copy of her claim file, the internal guidelines and rules First Reliance used in reaching its decision, and other information relevant to her claim. It also advised her about her rights under ERISA. (AR 155.)

3. *Discussion of the January 18, 2008 letter:* Returning to the criteria set out in ERISA regulations as to the content of a letter denying a claim for benefits, we conclude the January 18, 2008 letter properly included the specific reason or reasons for the adverse determination, i.e., "the in vitro fertilization process is not considered an illness according to your employer's policy"[9] and "the medical documents received list no complications of side effects from your treatment." It referred to the definitions of Disabled and Sickness, i.e., the specific plan provisions on which the determination was based. It stated that Ms.

---

[9] Infertility is a medical condition which has been recognized in the case law as a disorder of the reproductive system. *See*, e.g., <u>Erickson v. Bd. of Governors of State Colls…</u>, No. 95-2541, 1997 U.S. Dist. LEXIS 13313, *12-*13 (N.D. Ill., Sept. 2, 1997). It is possible that the Policy could have explicitly identified infertility as an illness and therefore undergoing treatment for it might have been covered by the short-term disability Plan. *See*, e.g., <u>Egert v. Conn. Gen. Life Ins. Co.</u>, 900 F.2d 1032, 1037 (7th Cir 1990), in which the court found that it was arbitrary and capricious for the administrator of a medical insurance plan to exclude treatment of infertility because the plan specifically identified the condition as an illness in its own internal guidelines.

Brown could request in writing a review of this decision and should provide with her request "any written comments, records or other information pertaining to your claim for benefits." While this portion of the denial letter could have been more explicit, Ms. Brown had already been advised by telephone at least as early as January 7, 2008, that if she also claimed that side effects from the medications administered between November 12 and December 7, 2007, were disabling, First Reliance would need "documentation from her physician that shows she complained of side effects." (AR 41.) The letter also included the necessary statement of Ms. Brown's rights under ERISA. We conclude, therefore, that the January 18, 2008, letter substantially complied with ERISA requirements in communicating an adverse decision. *See* Miller v. Am. Airlines, Inc., No. 10-1784, 2011 U.S. App. LEXIS 1462, *30-*36 (3d Cir. Jan. 25, 2011) (comparing cases and concluding that the letter sent to Miller was legally deficient in part because it did not mention the claimant's specific diagnoses or the precise information that was lacking and did not provide any instructions how Miller could achieve a favorable determination); Houser, 2010 U.S. Dist. LEXIS 128281 at * 30 (letter was adequate where it quoted specific plan provisions on which denial was based, informed plaintiff she could submit additional medical or vocational information, and explained her appeal rights); Conrad v. Wachovia Group Long Term Disability Plan,

CA No. 08-5416, 2010 U.S. Dist. LEXIS 98646, * 26 (D. N.J. Sept. 21, 2010) (there was "nothing cryptic" about a denial letter which stated that "the medical evidence on file does not support [Plaintiff's] inability to perform, on a full time basis, the material and substantial duties of any occupation for which he is qualified" and explained that he could "submit additional information or comments he deems pertinent for review.") As the Court of Appeals for the Fourth Circuit stated in Ellis v. Metropolitan Life Ins. Co.,

Ellis has somehow. . .come to the erroneous belief that MetLife is under an obligation to inform her of what she needs to tell MetLife in order to obtain disability benefits. That is not MetLife's role as a fiduciary. MetLife must treat each claimant with procedural fairness, but, because it must also guard against improper claims, it is not its duty to affirmatively aid claimants in proving their claims. MetLife's denial letter. . . substantially complies with the applicable ERISA regulations in all material respects.

126 F.3d 228, 235 (4th Cir. 1997).

4. *Appeal of the November 2007 application:* As noted above, Ms. Brown did not appeal this decision until May 16, 2008, after she had filed her second STD claim on May 6, 2008, which is discussed in the following section. During a conversation with Ms. Ghirlanda on May 9, 2008, Ms. Brown stated she did not appeal the prior decision because she did not know she could. Ms. Ghirlanda explained the appeal procedure (which had already been explained in the January 18, 2008 letter) and specifically noted that "she should

29

send in as much additional medical docs. [as possible] to support her claim." (AR 42.)

Ms. Brown appealed the January 18 decision on May 16, 2008, stating that Defendant had indicated in its denial letter (1) "IVF isn't considered a sickness" and (2) benefits were denied in part because the medical evidence did not reflect that she had disabling side effects from the medications she was taking as part of the IVF preparation process. (AR 85.) She reported that she had mentioned side effects to her nurse and enclosed with her letter copies of her pharmacist's drug monographs on which she had highlighted those side effects she experienced. She concluded by reminding First Reliance that she was willing to return to work in December but National was unable to accommodate her restriction to light work.

Unfortunately, this appeal letter did not enclose the type of information which would have helped Ms. Brown's cause, namely, medical evidence from Dr. Wakim regarding the purportedly disabling side effects or any explanation of why he considered Ms. Brown disabled November 12 through December 18. Ms. Brown had been told on numerous occasions via telephone and in writing that First Reliance did not consider the in vitro fertilization process a Sickness which could give rise to disability. Had Plaintiff sought and submitted a statement from Dr. Wakim explaining why that conclusion was incorrect or confirming that she had, in fact,

experienced debilitating side effects from the medications, it is possible Defendant would have reconsidered its initial decision.

On May 27, 2008, after First Reliance received Ms. Brown's appeal, a letter was sent to her, enclosing an authorization allowing the Quality Review Unit to obtain updated medical information if it was needed during the review process. (AR 83-84.) There is nothing in the record indicating that Ms. Brown completed and returned the authorization. On May 29, 2008, Laura M. Quinn, a Senior Benefit Analyst in Defendant's Quality Review Unit, called Ms. Brown to discuss her appeal. (AR 42-43.) Ms. Quinn explained that when she reviewed the additional materials Ms. Brown provided with her appeal letter, she had decided that an independent fertility specialist should review the file before Ms. Quinn issued her assessment. When Ms. Brown "expressed frustration" at this step, Ms. Quinn said she would try to expedite the independent physician review in order to get a decision as quickly as possible and would call her with a status update. In answer to Ms. Brown's questions about STD coverage for maternity leave after her child was born, Ms. Quinn stated, "I advised that her current pregnancy is directly related to her IVF at the [date of loss]; I cannot answer her question at this time as it will depend on whether her impairment is supported at the time of her work stoppage." Ms. Brown stated that she understood. (AR 82.)

31

As promised, Ms. Quinn promptly sent the file compiled through May 29, 2008, to Medical Evaluation Specialists and asked for the review be completed as soon as possible. (AR 43.) On June 9, she informed Ms. Brown that she had received Dr. Abbasi's report and advised Ms. Brown by telephone on June 12, 2008, that based on her own review and Dr. Abbasi's report, she had decided the initial decision by the Claims Department denying benefits had been correct. According to Ms. Quinn's notes, Ms. Brown terminated the call before she had an opportunity "to discuss the facts and Policy provisions relevant to reaching [her] decision." (AR 44.) Ms. Quinn followed up with a letter the same day.

E.    The May 2008 Application and Denial

1.    *The May 6, 2008 application:* Meanwhile, Ms. Brown had submitted a second application for STD benefits on approximately May 6, 2008, stating that she was unable to work because of her pregnancy as of November 9, 2007. (AR 152-153.) She further indicated that she was still off work, but should be able to return on September 29, 2008. The attending physician's statement, signed by Dr. James Nolfi, indicated that she first consulted with him regarding her pregnancy on January 31, 2008, and that she was unable to perform her job inasmuch as she could not lift more than 10 pounds and was unable to stand continuously. However, the form failed to provide the dates when she was unable to work. Similarly, the part of the

form to be completed by her employer was incomplete except for National's name, address, and telephone numbers.

Ms. Ghirlanda called to discuss the second claim with Ms. Brown on May 9, 2008.[10] She informed Plaintiff that her doctor did not provide dates for her disability and that employer section was incomplete and unsigned. Ms. Brown told Ms. Ghirlanda that she had been disabled since November 2007 and that when she tried to return after her IVF procedure, National could not accommodate her limitations. She asked Ms. Ghirlanda to return the forms to her.[11]

On May 15, Ms. Ghirlanda spoke with Susan Ahlborn who had signed the first claim form on behalf of National. Ms. Ahlborn confirmed that Ms. Brown had been released by her doctor for light duty on December 18, 2007, but that when National could not provide such work, Ms. Brown was laid off the same day and was receiving unemployment compensation.[12] (AR 42.)

  2. *The June 12, 2008 denial letter:* Between May 15 and June 12, Ms. Quinn and Ms. Brown spoke several more times on the

---

[10] This was the same call discussed in the previous section in which Ms. Brown and Ms. Ghirlanda discussed the process by which Plaintiff should appeal the initial denial.

[11] The Court has been unable to determine from the administrative record if the second set of claim forms or copies thereof were actually returned to Ms. Brown. They appear at AR 152-153 and no other revised or amended versions are in the record.

[12] This statement is in direct contradiction to Ms. Brown's representation in the benefits application that she was not receiving unemployment compensation benefits as of May 6, 2008. (AR 152.)

telephone, as summarized in the previous section. After the call on June 12, 2008, in which Ms. Quinn informed Ms. Brown that she was affirming the initial decision denying benefits, Ms. Quinn wrote to Ms. Brown. (AR 57-61.) In that letter, Ms. Quinn pointed out that the appeals process had involved decision making by a First Reliance employee (Ms. Quinn) independent of the person who had made the initial decision (Ms. Ghirlanda), and that Dr. Wakim's file from June 2006 through April 24, 2008, along with records from Dr. Nolfi, had been reviewed by Dr. Abbasi, a board certified specialist in obstetrics and gynecology who was also certified in reproductive endocrinology and infertility. The internal review, incorporating Dr. Abbasi's findings, had led to the conclusion that the medical evidence did "not substantiate any complications following your in vitro fertilization or resulting pregnancy that would have precluded you from performing the material duties of your job at the time of your work stoppage (11/12/07)." (AR 57.)

Referring to the previous statement in the January 18, 2008 letter that "in vitro fertilization, in and of itself, does not constitute a 'Sickness,' according to the terms of the group Policy," Ms. Quinn explained that the purpose of the review "was to determine in the medical data documents the presence of a physical or mental health condition that would limit your ability to perform your job." (AR 58.) Not only did the two surgical procedures occur on November

34

23 and 26, 2007, well after Ms. Brown had stopped working, but the medical reports indicated that there were no complications associated with either process. The review had included consideration of a Medical Certification Statement for Employee's Own Illness (AR 102), but this document was given little weight inasmuch as it was not signed or dated by any medical provider. The restrictions indicated in that document, i.e., no lifting greater than 10 pounds and no continuous standing, were again noted in a return-to-work form of December 18, 2007 (AR 103), about which First Reliance stated, "in our review of the medical data, we must conclude that the level of the severity of your condition is unsubstantiated by the documentation from your treatment providers," largely because there were no complaints in the medical record related to either the IVF process or the pregnancy itself. This position was corroborated by Dr. Abbasi, who had stated he had reviewed "the documentation and determined that no restrictions and limitations are supported by the records." (AR 58-59.)

Ms. Quinn also referred to the documentation provided about the potential side effects of the drugs Ms. Brown had taken during the weeks leading up to and immediately after the IVF process. She stated that these materials, "of a generic nature, do not support that you actually experienced the side effects," because the medical records did not include any references to them; moreover, the

35

specific conditions Ms. Brown had identified were symptoms which "typically do not preclude work function." (AR 59.)

Based on this review of all the materials Ms. Brown had submitted and as confirmed by Dr. Abbasi's independent assessment, Ms. Quinn concluded that Ms. Brown had been capable of performing the material duties of her job as of November 12, 2007, that is, she was not "Disabled" as that term was defined by the Policy.

Moving on a discussion of the May 6, 2008 application, First Reliance determined that Ms. Brown's coverage under the National Policy had terminated effective November 12, 2007, and that any claim for disability beginning after that date would not be covered because she had "never rejoined an 'Eligible Class' of employees." (AR 59.) Based on the definition of "Eligible Classes" in the Schedule of Benefits Provision of the Policy, the definition of "full-time" in the Definitions section thereof, and the evidence in the claim file that she never returned to work at National, Ms. Brown was not covered by the Policy after November 12, 2007. Consequently, the second application, seeking STD benefits beginning on November 12, 2007, and based on her pregnancy, had been denied. Ms. Quinn noted that the claim decision was now final and that Ms. Brown had exhausted any administrative remedies available under the Policy. The letter closed with a summary of Ms. Brown's rights under ERISA. (AR 60-61.)

After Ms. Brown engaged counsel to file suit, her attorney attempted to argue that Plaintiff had been denied the opportunity to appeal the decision denying the claim she submitted on May 6, 2008. Richard D. Walsh, Director of the First Reliance Quality Review Unit, wrote to Plaintiff's counsel on November 6, 2008, explaining that in Defendant's opinion, the two claims were not separate even though the first indicated that she was disabled due to the in vitro fertilization and ultimate pregnancy while the second covered only a claim for disability due to pregnancy. Because Ms. Brown had stated in both applications that her disability began November 2007, and because she never returned to work between the IVF process and the pregnancy/delivery period, First Reliance regarded the allegedly disabling conditions to be one event. He reiterated the conclusion that the second reason for denying the May 6, 2008 claim – even if it were considered a separate claim – was that Ms. Brown was not covered by the First Reliance STD policy after November 12, 2007. (AR 54-55.)

3. *Discussion and conclusion:* Ms. Brown's second application form was incomplete and internally contradictory. She indicated in the first part of the form that her disability began November 12, 2007, when she was definitely not pregnant, even though that was the purported cause of her disability. The part completed by Dr. Nolfi indicated that he had not begun treating Ms. Brown until

37

more than two months later, on January 31, 2008, and provided no dates when he considered that she was continuously unable to work. The portion to be completed by her employer was blank except for contact information. Ms. Brown was advised by telephone of these problems with the claim form as early as May 9, 2008, yet it appears she took no steps to rectify the omissions. Since it is clear from the second application that Ms. Brown believed that her disability began at the time she left work to begin IVF treatments and would continue through the delivery of her child, it was not unreasonable for First Reliance to consider both applications simultaneously as two aspects of the same purported disability. In addition, Plaintiff had been informed by Ms. Quinn on May 29, 2008 that First Reliance considered "her current pregnancy. . . directly related to her IVF" and that coverage during her pregnancy "will depend on whether her impairment is supported at the time of her work stoppage." (AR 82.)

Moreover, we agree with Defendant that Ms. Brown was not eligible in any case to submit the second application. Under the Policy, coverage granted to an Insured terminates when she "ceases to be in a class eligible for this insurance." (Policy, 6.0.) Classes eligible for the insurance are limited to "active, full-time employees." (Id., 1.0.) As pointed out in the June 12, 2008 letter, Ms. Brown conceded in the second application that she did not return to work for even one day after November 12, 2007. We conclude that

38

denial of the application for benefits submitted in May 2008 was neither arbitrary nor capricious and that First Reliance adequately conveyed the reasons for that denial in the letter of June 12, 2008.

## F.   Plaintiff's Remaining Arguments

Ms. Brown raises several related arguments in support of her motion for summary judgment which we will address briefly.   She first contends that the term "active" is never defined and that the definitions of "actively at work" and "active work" apply only when determining when coverage for an employee becomes effective (see Policy, 6.0), but these cannot be used generally to define an Eligible Class.   Therefore, the Policy is vague and, under principles of trust law and general contract construction, it should be construed in her favor.   (Plf.'s Brief at 14, *citing* Tester v. Reliance Std. Life Ins. Co., 228 F.3d 273, 375 (4th Cir. 2000), and Bailey v. Blue Cross & Blue Shield of Virginia, 67 F.3d 53, 57 (4th Cir. 1995).)

We need not address this argument in detail[13] because there is no question that as of November 12, 2007, Ms. Brown was no longer

---

[13]   We agree with Defendant that under Third Circuit precedent, the general principles of contract interpretation and in particular the reasoning of Tester on which Plaintiff relies do not apply when a court is reviewing denial of benefits under a deferential arbitrary and capricious standard, but only when the standard is *de novo*. While the Third Circuit has applied the *contra proferentem* principle of contract construction in ERISA cases, it has done so only to decide if a plan granted discretion to the administrator.   *See* Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257-58 (3d Cir. 1993).   In Ceccanecchio v. Cont'l Cas. Co., No. 01-4468, 2002 U.S. App. LEXIS 21496, *19-*20 (3d Cir. Oct. 15, 2002), the Court mentioned this issue without resolving it, but noted that a number of other courts had

working "full-time" which means, for a National employee at the Scottsdale facility, she would have been working "40 hours during [her] regular work week." Even if one accepts for sake of argument that "actively at work" and "active work" do not equate to "active," Ms. Brown still cannot show that she was a "full-time" employee at any time after November 9, 2007. In fact, the record shows that as of December 18, 2007, she was laid off and receiving unemployment compensation. (AR 42.)

Plaintiff next argues that First Reliance or National should have informed her that she would not be eligible for STD benefits unless she worked at least one day after she was allowed to return in December 2007. However, she cites no case law or ERISA regulation which requires such notification. (Plf.'s Brief at 12-13.) ERISA does place certain fiduciary duties on the plan administrator to inform participants of such things as cancellation of the plan, material reductions in coverage, or remedies available to them if they are denied benefits. See, e.g., Peralta v. Hispanic Business, Inc., 419 F.3d 1064, 1071 (9th Cir. 2005), citing 29 U.S.C. § 1104(a)(1)(B) in support of the principle that ERISA's "broad fiduciary responsibilities" encompass obligations on the plan administrator to timely notify employees of termination of their

___

concluded that the doctrine is inapplicable when invoking the arbitrary and capricious standard of review in considering the plan administrator's interpretation of the terms of a plan.

benefits. However, this Court is unaware of any requirement that the employer or plan administrator must provide suggestions about how benefits might be reinstated after termination *in addition to* the information provided in the Policy or the Plan. *See* Ellis v. Metropolitan Life, *supra* ("it is not [the fiduciary's] duty to affirmatively aid claimants in proving their claims.") The STD Plan Description provided to National employees states that if an employee has been on an approved leave of absence or on a temporary layoff, the insurance may be reinstated "if you return to Active Work with [National] within the period of time as shown on the Schedule of Benefits page," that is, within six months. (Doc. 30, Exh. C, National Envelope Corporation Short Term Disability Insurance Program Certificate with Summary Plan Description, 5.0-5.1.) As a participant in the Plan, Ms. Brown is presumed to be familiar with and understand her rights and obligations thereunder. *See* Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. and Research Found., 334 F.3d 365, 379 (3d Cir. 2003), *citing* 29 U.S.C. § 1022(a) and (b), noting that the latter requires the summary plan description to be "accurate" and "sufficiently comprehensive" because it is the document to which employees are most likely to refer in obtaining information and making decisions about how they are affected by the terms of the plan. Since "Active Work" is a defined term and reinstatement is premised upon return to "Active Work," Ms.

41

Brown's argument that First Reliance breached its fiduciary duty by failing to provide additional information to her is unavailing.

Plaintiff next argues that First Reliance acted arbitrarily and capriciously in regard to the information communicated (or not communicated) to her concerning the denial of benefits. That is, Ms. Brown claims that Defendant's refusal to allow her to remediate the "deficiencies" identified in the June 12, 2008 letter violates the ERISA provision which requires benefit plans to provide adequate notice to the plan beneficiaries. (Plf.'s Brief at 13-14.)

In hindsight, the reasons for denying STD benefits may have been more clear to Ms. Brown had First Reliance written two separate letters, the first affirming the decision in the January 2008 letter that undergoing IVF was not a sickness giving rise to disability and the second informing Ms. Brown that the second application would not be considered because it was incomplete or, alternatively, that she was not in an Eligible Class when she became pregnant and therefore was not covered. We cannot find, however, that First Reliance acted arbitrarily or capriciously in considering the two applications together especially since Ms. Brown herself stated in both applications that her disability began November 12, 2007. Moreover, as noted above, Ms. Quinn advised Ms. Brown of the relationship between the two applications as early as May 29, 2008.

Plaintiff also contends that the language of the Plan violates the special standard of care imposed by ERISA upon a plan administrator to discharge its duties "solely in the interests of the participant and beneficiaries" of the Plan. (Plf.'s Brief at 14-19, *citing* 29 U.S.C. § 1104(a)(1).)

As previously noted, First Reliance was the plan administrator for the National Plan and exercised final and binding discretionary authority over the decision making. Under ERISA provisions, Defendant was clearly a fiduciary with respect to the Plan. *See* 29 U.S.C. § 1002(21)(A). It was therefore required to "discharge [its] duties with respect to a plan solely in the interest of the participant and beneficiaries," and to discharge those duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(A) and (B). "But in discharging these duties, [the administrator is] also required to abide by the plan documents." Bicknell v. Lockheed Martin Group Benefits Plan, No. 10-1212, 2011 U.S. App. LEXIS 2715, *12 (3d Cir. Feb. 10, 2011), *citing* 29 U.S.C. § 1104(a)(1)(D). Where the administrator does so, "we cannot conclude that it breached any of its duties as fiduciary." Bicknell, id. Since we conclude that both Defendant's interpretation of coverage requirements and its application of the relevant provisions to the facts of Ms. Brown's

case were consistent with the defined terms in the Policy, we further conclude there has been no breach of its fiduciary duties in discharging its duties under the Plan.

Finally, Ms. Brown contends that First Reliance ignored substantial evidence supporting her claim when it refused to acknowledge that she was legitimately limited to only light duty work owing to the risks inherent in her IVF treatments and subsequent pregnancy. Specifically, she argues that both attending physicians' reports restricted her to work which precluded continuous standing and lifting more than ten pounds. She also references the Medical Certification for Employee's Own Illness which indicates in the same handwriting as that in Dr. Wakim's report that she was subject to the same restrictions. But, she argues, First Reliance "paid no attention" to these documents in concluding that "the level of the severity of [her] condition is unsubstantiated by the documentation from [her] treatment providers." This failure to acknowledge her limitations was an abuse of discretion, compounded by Defendant's reliance on Dr. Abbasi's unsubstantiated conclusion that "no restrictions and limitations are supported according to the records." While recognizing that ERISA plan administrators are not required to afford any special deference to the opinions of a treating physician, she contends that they may not arbitrarily refuse to credit a claimant's reliable evidence, including those opinions.

Because there is no evidence to contradict her physicians' limitations to no work during the period she was undergoing IVF treatments and light duty after she was released to return to work on December 18, 2007, First Reliance clearly acted arbitrarily and capriciously in denying benefits. (Plf.'s Brief at 19-23.)

In order to address this argument, it is necessary first to consider precisely what each physician stated in his records. Dr. Wakim did state that Plaintiff was continuously unable to work from November 12 through December 14, 2007. (AR 184.) However, as discussed above, there is nothing in his medical notes to support this assertion. By way of example, there is no reference to any conversation with Ms. Brown suggesting that being completely off work during that month was a requirement for undergoing the IVF procedure. Similarly, although Plaintiff was advised by telephone on May 9, 2008, that Dr. Nolfi's May 6, 2008 report was unacceptable, in part because it failed to identify the dates on which she was continuously unable to work, there is no evidence in the record that Plaintiff attempted to rectify this omission. To adopt Ms. Brown's position that these opinions should be controlling even though there is no support for them in the medical record would mean that any time a claimant's physician made such a statement, it must necessarily be accepted by the plan administrator. *See* Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003) (ERISA does not impose a duty

45

on plan administrators to accord special deference to the opinions of treating physicians, nor is there a heightened burden of explanation on administrators when they reject a treating physician's opinion.)

At the same time, we agree with Plaintiff that a plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 257-258 (3d Cir. 2004), quoting Black & Decker, id. at 834. However, the administrative record shows that far from arbitrarily refusing to credit the opinions of Drs. Wakim and Nolfi, First Reliance not only reconsidered their medical records from June 2007 through at least April 2008, but also provided those records to Dr. Abbasi who arrived at the same conclusion - Plaintiff was not disabled at the time she left National to undergo in vitro fertilization. As the Court of Appeals stated in Stratton, "[a] professional disagreement does not amount to an arbitrary refusal to credit." Id. at 258; see also Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp.2d 612, 627-628 (E.D. Pa. 2003) (reliance on recommendations of non-treating physicians over those of treating physicians does not necessarily mean that denial of disability benefits was arbitrary and capricious.)

Having considered each of Plaintiff's arguments for summary judgment in her favor, we find them unavailing. We also conclude

that the review process did not reveal procedural irregularities that might give us reason to doubt Defendant's "fiduciary neutrality." Post, 501 F.3d at 165. Where, as here, the Plan vests the administrator with discretion to determine eligibility for benefits, this Court is not free to substitute its own judgment for that of the plan administrator. Houser, 2010 U.S. Dist. LEXIS 128281 at *22, *citing* Lasser v. Reliance Std. Life Ins. Co., 344 F.3d 381, 384 (3d Cir. 2003). Inasmuch as Plaintiff has the burden at this stage of showing that First Reliance abused its discretion by denying her disability benefits, we therefore grant summary judgment in favor of Defendant. An appropriate Order follows.

March _17_, 2010                    _William L. Standish_

                                    William L. Standish
                                    United States District Judge

47